## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Hansen Banner, LLC,<br>1180 West Peachtree Street NE<br>Regions Plaza, Suite 2460<br>Atlanta, GA 30309 | : | CIVIL ACTION<br><br>Case No. _____ |
| Plaintiff, | : | |
| v. | : | |
| Aqua America, Inc.,<br>762 W. Lancaster Avenue<br>Bryn Mawr, Pennsylvania 19010 | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff Hansen Banner, LLC ("Hansen") brings this action for breach of contract against Defendant Aqua America, Inc. ("Aqua").

## INTRODUCTION

Hansen is a limited liability company engaged in the business of providing customer service and billing solutions to the energy and utility industries. Through a series of corporate transactions, in May 2014, Hansen became the lawful assignee of the rights and obligations of SCT Utility Systems, Inc. ("SCT") under a Technical Currency Agreement (the "TCA") between SCT and Defendant Aqua (as successor to Philadelphia Suburban Water Company). For more than two and a half years, from May 2014 through December 2016, Hansen and Aqua each performed their respective obligations, and accepted the benefits of the other parties' performance, under the TCA.

In January 2017, Aqua sought to terminate the TCA, effective as of May 1, 2017, the beginning of the new "Contract Year" under the agreement. However, pursuant to its clear terms, the TCA could only be terminated upon advance written notice at least six months prior to the start of a given Contract Year.  Accordingly, Aqua's attempt to terminate the TCA in January 2017 was invalid.  Since May 1, 2017, Aqua has refused to pay Hansen a total of $406,233.62 due to it under the TCA.

Hansen now brings this action to recover the amounts to which it is rightfully entitled under the TCA, which Aqua has refused to pay in clear and flagrant breach of the express terms of the agreement.

## THE PARTIES

1.      Plaintiff Hansen is a Delaware limited liability company.  Hansen's sole member is Hansen Technologies North America, Inc., a corporation duly organized under the laws of Delaware with its principal place of business in New York, New York. Accordingly, under 28 U.S.C. § 1332(c), Hansen is a citizen of Delaware and New York.

2.      Defendant Aqua is a corporation duly organized under the laws of Pennsylvania with its principal place of business in Bryn Mawr, Pennsylvania.  Accordingly, under 28 U.S.C. § 1332(c), Aqua is a citizen of Pennsylvania.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different states.

4.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391 because Aqua resides in this District and a substantial part of the events giving rise to Hansen's claim occurred in this District.

## FACTUAL BACKGROUND

5.      Plaintiff Hansen is engaged in the business of providing customer service and billing solutions to the energy and utility industries.  Among the products that Hansen offers to customers are its Banner Customer Information System ("CIS"), Banner Customer Contact System ("CCS"), and Banner Electronic Work Queue ("EWQ") software programs (collectively, the "Banner Software").

6.      Hansen acquired the Banner Software and related assets in May 2014 from Ventyx, Inc. ("Ventyx") and ABB Technology Ltd. ("ABB").  As part of this acquisition, Hansen was assigned all of Ventyx's and ABB's rights under the Technical Currency Agreement (the "TCA") attached hereto as Exhibit A and the Software License and Services Agreement (the "License Agreement") attached hereto as Exhibit B.

7.      As the agreements state, the TCA and the License Agreement were originally entered into on or about October 31, 1996 by SCT Utility Systems, Inc. ("SCT") and Philadelphia Suburban Water Company ("PSWC").  PSWC, which was referred to in the TCA as "Licensee," has since changed its name to Aqua.

8.      Pursuant to the TCA, SCT agreed to provide Aqua with maintenance and enhancement services with respect to the Banner Software, in exchange for specified service fees.  *See* TCA and Exhibit 1 thereto.

9.      The initial term of the TCA with respect to each "Baseline Component System" of the Banner Software (*i.e.*, CIS, CCS and EWQ) expired on April 30, 2000.  *See id.*

3

10.    The TCA further states that:

> For each Baseline Component System, this Agreement will
> automatically be extended for consecutive Contract Years beyond
> the Expiration Date on a year-to-year basis…unless Licensee
> notifies SCT in writing of its intent not to extend this Agreement
> for any particular Baseline Component System at least six (6)
> months prior to the Expiration Date, or, for any Contract Year
> subsequent to the Expiration Date, at least six (6) months prior to
> the expiration of the then-current Contract Year.

TCA, § 5.

11.    SCT and Aqua each performed their respective obligations under the TCA

through the end of the initial term on April 30, 2000, and the TCA automatically renewed

effective May 1, 2000.

12.    SCT and Aqua continued to perform under the TCA, and the term of the TCA

continued automatically to renew, through 2003.

13.    In early 2003, Indus International ("Indus") acquired SCT's utility business.  As

part of this transaction, SCT's rights and obligations under the TCA and the License Agreement

were assigned to Indus.

14.    The assignment of the TCA and the License Agreement were expressly permitted

by the terms of the agreements.  Specifically, Section 13 of the License Agreement, which is

incorporated by reference in the TCA, states that:

> Neither party may assign any of its rights or obligations under this
> Agreement, and any attempt at such assignment will be void
> without the prior written consent of the other party.  For purposes
> of this Agreement, "assignment" shall include use of the Licensed
> Software for benefit of any third party to a merger, acquisition
> and/or other consolidation by, with or of Licensee, including any
> new or surviving entity that results from such merger, acquisition
> and/or other consolidation. However, the following shall not
> be considered "assignments" for purposes of this Agreement:
> SCT's assignment of this Agreement or of any SCT rights
> under this Agreement to SCT's successor by merger or
> consolidation or to any person or entity that acquires all or

4

> substantially all of its capital stock or assets; and SCT's
> assignment of this Agreement to any person or entity to which
> SCT transfers any of its rights in the Licensed Software.

License Agreement (Exhibit B hereto), § 13; TCA (Exhibit A hereto), § 1.

15.     Indus subsequently changed its name to Ventyx.

16.     As noted above, in May 2014, Hansen acquired the Banner Software from Ventyx and, in connection with the acquisition Ventyx assigned all of its rights and obligations under the TCA and the License Agreement to Hansen.

17.     Shortly after the acquisition of the Banner Software became effective, Aqua was provided with written notice of the acquisition and the assignment to Hansen of the License Agreement and the TCA.  A true and correct copy of the letter sent by Ventyx to its customers providing notice of the acquisition is attached hereto as Exhibit C.

18.     Upon receiving this notice in 2014, Aqua raised no objection to the assignment of either the TCA or the License Agreement.

19.     From May 2014 through January 2017, Hansen performed all of its obligations under the TCA and the License Agreement, and Aqua paid Hansen all of the fees and other amounts due under those agreements.

20.     Among the products and services provided by Hansen to Aqua under the TCA were access and services relating to MicroFocus COBOL software needed to utilize the Banner Software.

21.     From May 2014 through January 2017, Aqua never raised any objection to the assignments of the TCA and the License Agreement to Hansen, or to Hansen's rights under either the TCA or the License Agreement.

22.     As noted above, the TCA may be terminated by Aqua only upon six months' written notice in advance of the commencement of a new "Contract Year" under the agreement. The Contract Year under the TCA begins on May 1 of any given year.

23.     Aqua did not provide written notice of termination of the TCA prior to November 1, 2016. Accordingly, as of November 1, 2016, the TCA renewed for the Contract Year beginning on May 1, 2017.

24.     On or about February 1, 2017, Aqua sent Hansen a letter dated January 30, 2017 purporting to terminate the TCA effective May 1, 2017. A true and correct copy of the letter is attached hereto as Exhibit D.

25.     Aqua's purported notice of termination was ineffective because it was not delivered at least six months' prior to the start of the Contract Year commencing May 1, 2017, as required by the express terms of the TCA.

26.     Accordingly, the TCA remained in effect for the Contract Year beginning May 1, 2017 and ending April 30, 2018 (the "2017-2018 Contract Year").

27.     By email dated April 14, 2017, Hansen provided written notice to Aqua that Aqua's purported termination of the TCA was invalid. A true and correct copy of the email sent to Aqua is attached as Exhibit E.

28.     Aqua responded to Hansen's position by letter dated May 5, 2017, asserting that "the [TCA] and the apparent attempt to assign it to Hansen is void." A true and correct copy of the letter received by Hansen is attached as Exhibit F.

29.     Hansen responded to Aqua's letter on May 17, 2017, reiterating that the TCA remained in effect and that Aqua's attempt to terminate it was untimely. A true and correct copy of the letter sent by Hansen is attached as Exhibit G.

6

30.    On October 12, 2017, Aqua sent Hansen a letter stating:

> [W]hile Aqua is of the position that there is no contractual
> relationship pursuant to the Original Agreement, to the extent there
> is, or it is found that there is, a valid contractual relationship
> pursuant to the Original Agreement or in any other manner, _Aqua
> hereby notices its intent to terminate the Original Agreement, as
> well as any other agreements or contractual relationship the
> parties may have for Services_."

A true and correct copy of the letter received by Hansen is attached as Exhibit H.

31.    Aqua's position is contradicted by the plain language of the TCA and the fact that

Aqua acquiesced to the assignment to Hansen, and performed and accepted Hansen's

performance under the TCA, for more than two and a half years before ever claiming the TCA

was no longer in effect.

32.    Notwithstanding its obligations under the TCA, Aqua refused to pay Hansen the

services fees due under the TCA for the 2017-2018 Contract Year.

33.    The services fees for the Banner Software due to Hansen under the TCA for the

2017-2018 Contract Year total $406,233.62.

34.    Pursuant to the TCA, the services fees for the Banner Software for the 2017-2018

Contract Year were due to be paid to Hansen by Aqua no later than May 1, 2017.

35.    As of the date hereof, Aqua has not paid Hansen any portion of the service fees

under the TCA for the 2017-2018 Contract Year.

36.    Despite its contention that the TCA as a whole is no longer in effect, Aqua has

continued to utilize the MicroFocus COBOL software under the TCA and paid Hansen

$21,271.99 for the software and related services for 2017-2018 Contract Year.

37.    Pursuant to the TCA, Aqua's failure to remit payment to Hansen within thirty

days of receipt of Hansen's invoice entitles Hansen to recover late charges specified in the TCA.

_See_ TCA, § 4(d).

## COUNT I: BREACH OF CONTRACT

38.     Hansen incorporates the allegations in paragraphs 1 through 37 as if fully set forth herein.

39.     Hansen was validly assigned the TCA in May 2014, and is entitled to receive all benefits and assert all rights under that agreement.

40.     Further, by failing to object to the assignment of the TCA after receiving written notice, and accepting the benefits of Hansen's performance under the TCA, from May 2014 until January 2017, Aqua has consented to the assignment of the TCA to Hansen and waived any right to object to such assignment.

41.     Accordingly, the TCA constitutes a valid and enforceable agreement between Hansen and Aqua.

42.     Aqua breached its obligations under the TCA by failing to pay Hansen the service fees due under the agreement for the 2017-2018 Contract Year.

43.     As a result of Aqua's breach of its contractual obligations under the TCA, Hansen has sustained damages.

WHEREFORE, Plaintiff Hansen Banner, LLC demands judgment in its favor and against Defendant Aqua America, Inc. for the amounts owed under the TCA and other compensatory

damages, together with interest, costs of suit, attorney's fees, and such other and further relief as

the Court deems just and proper.

Alan D. Berkowitz (Bar No. 32735)
J. Downes (Bar No. 88505)
Dechert LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Attorneys for Hansen Banner, LLC

Dated: January 30, 2018

# EXHIBIT A



TECHNICAL CURRENCY AGREEMENT

SCT UTILITY SYSTEMS, INC.
Carolina Research Park
9 Science Court
Columbia, SC 29203-9344
FAX Number (803) 935-8032
("SCT")

and

PHILADELPHIA SUBURBAN WATER COMPANY
762 Lancaster Avenue
Bryn Mawr, PA 19010
("Licensee")

THIS AGREEMENT is made between SCT and Licensee on the Commencement Date of ___10/31___

_____, 1996.

SCT and Licensee have entered into a Software License and Services Agreement with an Effective Date of _____ (the "License Agreement") for the Licensed Software. Licensee desires that SCT provide Maintenance and Enhancements for and new releases of the Baseline Licensed Software identified in Exhibit I on the terms and conditions contained in this Agreement. Accordingly, the parties agree as follows:

1.      Incorporation By Reference. Sections 1 (Definitions), 8 (Confidential Information) and 11 through 15, inclusive (Notices, Force Majeure, Assignment, No Waiver and Choice of Law; Severability, respectively) of the License Agreement are incorporated into this Agreement by this reference as fully as if written out below. If any provision incorporated by reference from the License Agreement conflicts with any provision of this Agreement, the provision of this Agreement will control.

2.      Additional Definitions.

(a) "Commencement Date" means the date identified above in this Agreement as the Commencement Date.

(b) "Contract Year" means, with respect to each Baseline Component System, each one (1) year period beginning and ending on the dates provided for in Exhibit I for such Baseline Component System.

(c) "Enhancements" means general release (as opposed to custom) changes to a Baseline Component System which increase the functionality of the Baseline Component System.

(d) "Expiration Date" means, with respect to each Baseline Component System, the date upon which the initial term of this Agreement ends for such Baseline Component System as provided for in Exhibit I.

(e) "Improvements" means, collectively, Maintenance, Enhancements and New Releases

provided under this Agreement.

(f) "Maintenance" means using reasonable efforts to provide Licensee with avoidance procedures for or corrections of Documented Defects.

(g) "New Releases" means new editions of a Baseline Component System.

(h) "Partial Year" means, for each Baseline Component System, the period between the Commencement Date and the first day of the initial Contract Year for that Baseline Component System.

3.      Services.

(a) Types of Services. During the term of this Agreement, SCT will provide Licensee with Maintenance for, Enhancements of, and New Releases of each Baseline Component System identified in Exhibit I.

(b) Limitations. All Improvements will be part of the applicable Baseline Component System and will be subject to all of the terms and conditions of the License Agreement and this Agreement. SCT's obligation to provide Licensee with Improvements for Baseline Component Systems owned by parties other than SCT is limited to providing Licensee with the Improvements that the applicable third party owner provides to SCT for that Baseline Component System. Licensee must provide SCT with such facilities, equipment and support as are reasonably necessary for SCT to perform its obligations under this Agreement, including remote access to the Equipment. Further, and

notwithstanding any other provision of this Agreement or the License Agreement, SCT shall only be required to provide Licensee with Improvements for a single instance of the Licensed Software at a single location in the United States. In this regard, Licensee shall identify the aforementioned Equipment and location in a writing to SCT as soon as reasonably practicable after the Effective Date and SCT's obligations set forth in this Agreement will only apply to the single instance of the Licensed Software operating on the Equipment and at the location so identified.

### 4.    Payment and Taxes.

(a) Technical Currency Fees.    For the Improvements for each Baseline Component System, Licensee will pay SCT: (i) the amount provided for in Exhibit 1 as the Partial Year payment (if applicable) on the payment date provided for in Exhibit 1; and (ii) the amount provided for in Exhibit 1 as the "Payment Amount" for the first Contract Year; and (iii) for each Contract Year subsequent to the initial Contract Year, an amount invoiced by SCT, which amount will not exceed by more than the "Annual Escalation Not to Exceed Percentage" provided for in Exhibit 1 the fee that Licensee was obligated to pay to SCT for Improvements for the applicable Baseline Component System in the immediately preceding Contract Year for that Baseline Component System.    Fees for Improvements for a Baseline Component System are due on the first day of the first month of the Contract Year for that Baseline Component System.

(b) Additional Costs. Licensee will also reimburse SCT for actual travel and living expenses that SCT incurs in providing Licensee with Improvements under this Agreement, with reimbursement to be on an as-incurred basis. SCT will use reasonable efforts to limit travel and living expenses by using coach air fare, booked in advance when available, staying at hotels identified in advance by Licensee as offering Licensee's contractors a discounted rate, and sharing rental cars. Licensee will also reimburse SCT for all charges incurred in connection with accessing Equipment. Reimbursement is subject to any statutory reimbursement limitations imposed on Licensee contractors, and Licensee will provide SCT with a copy of such limitations before SCT incurs expenses.

(c) Taxes. Licensee is responsible for paying all taxes (except for taxes based on SCT's net income or capital stock) relating to this Agreement, the Improvements, any services provided or payments made under this Agreement. Applicable tax amounts (if any) are NOT included in the fees set forth in this Agreement. If Licensee is exempt from the payment of any such taxes, Licensee must provide SCT with a valid tax exemption certificate; otherwise, absent proof of Licensee's direct payment of such tax amounts to the applicable taxing authority, SCT will invoice Licensee for and Licensee will pay to SCT all such tax amounts.

(d) Late Charges.    Licensee will pay each SCT invoice by no later than thirty (30) days after receipt. Late payments are subject to a late charge equal to the lesser of: (i) the prime lending rate established from time to time by Mellon Bank, N.A., Philadelphia, Pennsylvania, plus one percent (1%); or (ii) the highest rate permitted by applicable law.

### 5.    Term.    As it applies to each Baseline Component System, the term of this Agreement is for the period beginning on the Commencement Date and continuing until the Expiration Date for that Baseline Component System.    For each Baseline Component System, this Agreement will automatically be extended for consecutive Contract Years beyond the Expiration Date on a year-to-year basis unless SCT notifies Licensee in writing of its intent not to extend this Agreement for any particular Baseline Component System at least twelve (12) months prior to the Expiration Date, or, for any Contract Year subsequent to the Expiration Date, at least twelve (12) months prior to the expiration of the then-current Contract Year , or unless Licensee notifies SCT in writing of its intent not to extend this Agreement for any particular Baseline Component System at least six (6) months prior to the Expiration Date, or, for any Contract Year subsequent to the Expiration Date, at least six (6) months prior to the expiration of the then-current Contract Year

### 6.    Limited Warranty and Disclaimer of Warranties.

(a) Limited Warranty by SCT For New Releases and Enhancements and Remedy For Breach. For each New Release and Enhancement provided to Licensee under this Agreement, SCT warrants to Licensee that, for a period of twelve (12) months after SCT has delivered such New Release and/or Enhancement to Licensee, such New Release and/or Enhancement, as used by Licensee on the Equipment for the computing operations authorized in the License Agreement, will operate without Documented Defects. For each Documented Defect, SCT, as soon as reasonably practicable and at its own expense, will provide Licensee with Maintenance. If, despite its reasonable efforts, SCT is unable to provide Licensee with Maintenance, then, subject to the limitations set forth in Section 8 of this Agreement, Licensee may pursue its remedy at law to recover direct damages resulting from the breach of this limited warranty. These remedies are exclusive and are in lieu of all other remedies, and SCT's sole obligations for breach of this limited warranty are contained in this Section 7(a).

(b) Disclaimer of Warranty and Conditions. The limited warranty in Section 7(a) is made to Licensee exclusively and is in lieu of all other warranties.

### 6.    Disclaimer of Warranties.    Licensee agrees and understands that SCT MAKES NO WARRANTIES WHATSOEVER, EXPRESSED OR IMPLIED, WITH REGARD TO ANY IMPROVEMENTS AND/OR ANY OTHER MATTER RELATING TO THIS AGREEMENT, AND THAT SCT EXPLICITLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. FURTHER, SCT EXPRESSLY DOES NOT WARRANT THAT A COMPONENT SYSTEM OR ANY IMPROVEMENTS WILL BE USABLE BY LICENSEE IF THE COMPONENT SYSTEM HAS BEEN MODIFIED BY ANYONE OTHER THAN SCT, OR WILL BE ERROR FREE, WILL OPERATE WITHOUT INTERRUPTION OR WILL BE COMPATIBLE WITH ANY HARDWARE OR SOFTWARE OTHER THAN THE EQUIPMENT.

7. **Non-Hiring of Employees.** During the term of this Agreement and any extension hereof, neither party, nor any related or affiliated organization over which a party has control, shall offer to hire, hire or in any way employ or compensate any employee of, or persons who have been employed during any term hereof by, the other party without the prior written consent of the other party. Notwithstanding the foregoing, the following exceptions shall apply:

(a) Either SCT or the Licensee may hire or solicit for hiring any employee who is no longer employed by the other and whose employment with the other had ended for a period of six (6) months or more prior to the date of the offer of employment by such other party; and

(b) Either party may immediately hire or solicit for hiring any former employee of the other if such other party involuntarily terminated such former employee's employment with the other party for any reason other than for avoiding the six (6) month "no hiring" period described in Section 7(a) above.

8. **Termination.** A party has the right to terminate this Agreement if the other party breaches a material provision of this Agreement. Either party has the right to terminate this Agreement at any time while an event or condition giving rise to the right of termination exists. To terminate this Agreement, the party seeking termination must give the other party notice that describes the event or condition of termination in reasonable detail. From the date of its receipt of that notice, the other party will have thirty (30) days to cure the breach to the reasonable satisfaction of the party desiring termination. If the event or condition giving rise to the right of termination is not cured within that period, this Agreement will automatically be deemed terminated at the end of that period. However, notice to SCT of a suspected Documented Defect will not constitute a notice of termination of this Agreement. Termination of this Agreement will be without prejudice to the terminating party's other rights and remedies pursuant to this Agreement.

## 9. LIMITATIONS OF LIABILITY.

(a) **LIMITED LIABILITY OF SCT.** SCT'S LIABILITY IN CONNECTION WITH THE IMPROVEMENTS OR ANY OTHER MATTER RELATING TO THIS AGREEMENT WILL NOT EXCEED THE FEES THAT LICENSEE ACTUALLY PAID TO SCT FOR THE IMPROVEMENTS FOR THE YEAR THAT SUCH LIABILITY ARISES.

(b) **EXCLUSION OF DAMAGES.** REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, IN NO EVENT WILL SCT BE LIABLE TO LICENSEE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT SCT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

(c) **BASIS OF THE BARGAIN.** LICENSEE ACKNOWLEDGES THAT SCT HAS SET ITS FEES AND ENTERED INTO THIS AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF LIABILITY AND THE DISCLAIMERS OF WARRANTIES AND DAMAGES SET FORTH IN THIS AGREEMENT, AND THAT THE SAME FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES.

10. **Entire Agreement.** This Agreement contains the entire understanding of the parties with respect to its subject matter, and supersedes and extinguishes all prior oral and written communications between the parties about its subject matter. Any purchase order or similar document which may be issued by Licensee in connection with this Agreement does not modify this Agreement. No modification of this Agreement will be effective unless it is in writing, is signed by each party, and expressly provides that it amends this Agreement.

THE PARTIES have executed this Agreement through the signatures of their respective authorized representatives.

**SCT**

By: _____
William T. Mahoney
(Printed Name of Signatory)

Title: President

**LICENSEE**

By: _____
Roy H. Stahl
(Printed Name of Signatory)

Title: Senior Vice President

 **SCT**

**EXHIBIT 1**

Licensee:    Utility & Municipal Services, Inc.

PARTIAL YEAR PAYMENT/DUE DATE: Period from Commencement Date through May 1, 1997 - NO ADDITIONAL FEE

FIRST ANNUAL CONTRACT YEAR PAYMENT DATE:    May 1, 1997

ANNUAL ESCALATION NOT TO EXCEED: 10% OF PRIOR FULL-YEAR ANNUAL PAYMENT.

| Baseline Component System | Contract Year Begins/Ends | Expiration Date | First        Annual Payment Amount |
|---|---|---|---|
| BANNER Customer Information System ("CIS") | May 1/April 30 | April 30, 2000 | $59,625 |
| BANNER Customer Contact System ("CCS") | May 1/April 30 | April 30, 2000 | $9,937 |
| BANNER Electronic Work Queue ("EWQ") | May 1/April 30 | April 30, 2000 | $3,975 |
| TOTAL: | | | $73,537 |

SCT

By: _____

_William T. Mahoney_  _President_
(Printed Name and Title of Signatory)

LICENSEE

By: _____

_Roy H. Stahl_  _Senior Vice President_
(Printed Name and Title of Signatory)

# EXHIBIT B



**SOFTWARE LICENSE &**
**SERVICES AGREEMENT**

SCT UTILITY SYSTEMS, INC.
Carolina Research Park
9 Science Court
Columbia, SC 29203-9344
FAX Number (803) 935-8032
("SCT")

and

PHILADELPHIA SUBURBAN WATER COMPANY
762 Lancaster Avenue
Bryn Mawr, PA 19010
("Licensee")

T HIS AGREEMENT is made between SCT and Licensee as of the Effective Date. The parties agree as follows:

**1. Definitions.**

(a). "Acceptance" refers ONLY to Customization Specifications and Customizations, and means the passage of the five (5) business day period following the expiration of the Testing Period without Licensee advising SCT of the existence of a material non-conformance (as defined under "Testing Period" below) within the Customization Specification or Customization, as applicable.

(b) "Baseline" means the general release version of a Component System as updated to the particular time in question through both SCT's warranty services and SCT's Technical Currency Program, but without any other modification whatsoever.

(c) "Component System" means any one of the computer software programs which is identified in Exhibit 1 as a Component System, including all copies of Source Code (if provided), Object Code and all related specifications, documentation, technical information, and all corrections, modifications, additions, improvements and enhancements to and all Intellectual Property Rights for such Component System.

(d) "Confidential Information" means non-public information of a party to this Agreement that is clearly designated as "confidential" or "proprietary" or in some similar fashion. Confidential Information of SCT includes the Licensed Software, all software provided with the Licensed Software, and algorithms, methods, techniques and processes revealed by the Source Code of the Licensed Software and any software provided with the Licensed Software. Confidential Information does not include information that: (i) is or becomes known to the public without fault or breach of the Recipient; (ii) the Discloser regularly discloses to third parties without restriction on disclosure; or (iii) the Recipient obtains from a third party without restriction on disclosure and without breach of a non-disclosure obligation.

(e) "Covered Services" means: (i) any water, wastewater, refuse or other miscellaneous utility services

other than gas or electric services; and (ii) any services provided by a municipality (other than gas or electric services), provided that such municipality is located within fifty (50) miles from Licensee's offices in Bryn Mawr, Pennsylvania.

(f) "Customer" means each individual or entity to whom a utility provider sends or otherwise delivers a bill or invoice for utility services.

(g) "Customer Base" means: (i) those persons and entities that, as of October 31, 1996, obtain Covered Services from Licensee or a utility provider identified in Exhibit 2 (attached hereto); and (ii) those additional persons and entities which, after October 31, 1996, obtain Covered Services from Licensee or a utility provider identified in Exhibit 2 as a result of such utility provider's "natural growth." A utility provider's "natural growth" refers to an increase in the number of Covered Services customers in the provider's geographic region of service as of October 31, 1996, which growth was not accomplished through a merger, acquisition, consolidation or similar transaction.

(h) "Customization" means any SCT-developed changes to the Source Code and/or Object Code in compliance with a Customization Specification.

(i) "Customization Specification" means the detailed specification that SCT will create in each instance for a Customization, which Customization Specification will be created by SCT in accordance with a general description therefor that Licensee and SCT will agree upon, and from which Customization Specification SCT will generate the Source Code and Object Code for such Customization.

(j) "Delivery Address" means the Licensee shipping address set forth in Exhibit I as the Delivery Address.

(k) "Delivery Date" means, for each Component System, a date on or before December 31, 1996 on which Licensee installs the Licensed Software on the Equipment and demonstrates the functionality of the Licensed Software on the Equipment using SCT test data and test scripts. To

the extent that SCT is ready, willing and able to install the Licensed Software on the Equipment and demonstrate the functionality of the Licensed Software as described above on or before December 31, 1996 but is unable to do so because: (i) the Equipment has not been installed; (ii) Licensee has not provided access to SCT in order to enable SCT to install the Licensed Software and demonstrate its functionality; or (iii) Licensee has not reasonably cooperated in the scheduling of the installation or demonstration, then, in any of these events, the Delivery Date will be deemed to have occurred on December 31, 1996.

(l) "Discloser" means the party providing the Confidential Information to the Recipient.

(m) "Documented Defect" means a material deviation between the Baseline Component System or Customization (as applicable) and its documentation or Customization Specification (as applicable), for which Documented Defect SCT has confirmed that Licensee has given SCT enough information for SCT to replicate the deviation on a computer configuration which is both comparable to the Equipment and is under SCT's control.

(n) "Effective Date" means the date identified on the signature page of this Agreement as the Effective Date.

(o) "Equipment" means the hardware and systems software configuration identified in Exhibit 1 as the Equipment.

(p) "Exhibit 1" means, collectively: (i) The schedule attached to this Agreement which is marked as "Exhibit 1," including all attached Software Supplements; and (ii) any schedule also marked as "Exhibit 1" (also including any attached Software Supplements) that is attached to any amendment to this Agreement.

(q) "Intellectual Property Rights" means all patents, patent rights, patent applications, copyrights, copyright registrations, trade secrets, trademarks and service marks and Confidential Information.

(r) "Licensed Software" means the Component Systems listed in Exhibit 1.

(s) "Licensee Employees" means: (i) Licensee's employees with a need to know; (ii) the employees of Utility & Municipal Services, Inc. with a need to know; and (iii) third party consultants engaged by Licensee who have a need to know, who have been pre-approved by SCT, and who, prior to obtaining access to the Licensed Software, have executed an SCT-approved non-disclosure agreement.

(t) "Object Code" means computer programs assembled, compiled, or converted to magnetic or electronic binary form on software media, which are readable and usable by computer equipment.

(u) "Permitted Service Bureau Processing" means use of the Licensed Software to provide commercial service bureau data processing services to the third party utility providers expressly identified on Exhibit 2 (subject to all restrictions contained therein) for the sole purpose of providing customer information and billing services to the Customer Base of each of these utility providers. As used in Exhibit 2, "affiliates" means any entity controlled by, controlling or under common control with the providers identified in Exhibit 2 as of the Effective Date.

(v) "Recipient" means the party receiving Confidential Information of the Discloser.

(w) "Software Supplement" means, with respect to a Component System, the addendum provided as part of Exhibit 1 that contains additional terms, conditions, limitations and/or other information pertaining to that Component System. If any terms of a Software Supplement conflicts with any other terms of this Agreement, the terms of the Software Supplement will control.

(x) "Source Code" means computer programs written in higher-level programming languages, sometimes accompanied by English language comments and other programmer documentation.

(y) "Testing Period" means: (i) for a Customization Specification, the ten (10) business days following Licensee's receipt of such Customization Specification during which period Licensee can verify whether such Customization Specification conforms in all material respects with the general description upon which such Customization Specification is based; and (ii) for a Customization, the ten (10) business days following Licensee's receipt of such Customization during which Licensee can verify whether such Customization conforms in all material respects with the Customization Specification therefor. Such Testing Periods may be modified by agreement of the parties in any instance to reflect the relative importance and complexity of the Customization Specification or Customization (as applicable) in question.

2. **Right to Grant License and Ownership.** SCT has the right to grant Licensee this license to use the Licensed Software. Except as otherwise indicated in a Software Supplement, SCT owns the Licensed Software.

3. **License.** Subject to the terms and conditions of this Agreement, SCT grants Licensee a perpetual, non-exclusive, non-transferable license to use the Licensed Software (and a reasonable number of copies thereof) on the Equipment within the United States of America: (i) for Licensee's own computing operations, and for the computing operations of Utility & Municipal Services, Inc., for the sole purpose of providing customer information and billing services to: (1) the Customer Base of Licensee (which Customer Base comprises approximately 265,000 water Customers as of October 31, 1996); and (2) an additional 135,000 Customers of Licensee above and beyond Licensee's Customer Base; and (ii) for Permitted Service Bureau Processing, all in accordance with all other terms and conditions of this Agreement. The computer readable media containing Source Code and Object Code for the Licensed Software may also contain Source Code and Object Code for Component Systems for which Licensee is not granted a license for use. Licensee may not make any use of any Source Code and/or Object for any such Component Systems for which Licensee is not expressly obtaining a license for use under this Agreement. Any rights not expressly granted in this Agreement are expressly reserved.

(a) Source Code. If Exhibit 1 to this Agreement does not otherwise provide that Licensee has a license to use Source Code for a particular Component System, then Licensee has no rights in or to the Source Code for that Component System. Only with respect to the Component Systems for which the Source Code is so licensed, Licensee has the right to compile, modify, improve and enhance the Licensed Software. Licensee will not disclose all or any part of the Source Code for the Licensed Software to any person except Licensee Employees who, before obtaining access to the Source Code, have been informed by Licensee in writing of the non-disclosure obligations imposed on both Licensee and such Licensee Employees under this Agreement.

(b) Object Code. Licensee has right to use the Licensed Software in Object Code form. Licensee also has the right to use the Licensed Software in Object Code form temporarily on another SCT-supported configuration, for disaster recovery of Licensee's computer operations.

(c) Documentation. Except as otherwise provided for in the applicable Software Supplement, Licensee can make a reasonable number of copies of the documentation for each Component System for its use in accordance with the terms of this Agreement.

(d) Restrictions on Use of the Licensed Software. Licensee is prohibited from causing or permitting the reverse engineering, disassembly or decompilation of the Licensed Software. Except as otherwise provided for in Sections 3(i) and 3(ii) above and Section 3(e) below, Licensee is prohibited from using the Licensed Software to provide service bureau data processing services or to otherwise provide data processing services to third parties. Licensee will not allow the Licensed Software to be used by, or disclose all or any part of the Licensed Software to, any person except Licensee Employees. Notwithstanding the foregoing, Licensee is permitted to allow use of the input and/or output sensory displays of or from the Licensed Software by third parties on a strict "need to know" basis, and such use shall not be deemed a non-permitted disclosure of the Licensed Software. Licensee will not allow the Licensed Software, in whole or in part, to be exported outside of the United States of America, in any manner or by any means, without in each instance obtaining SCT's prior written consent and, if required, a validated export license from the Office of Export Administration within the U.S. Department of Commerce and such other appropriate United States governmental authorities.

(e) Option to Expand Use of the Licensed Software.

(i) So long as Licensee (for purposes of this subsection 3(e), the rights granted to Licensee are also granted hereby to Utility & Management Municipal Services, Inc.) has not terminated the Technical Currency Agreement executed by the parties on or about the Effective Date and is in good standing thereunder (having paid all fees due in a timely manner), and so long as this Software License & Services Agreement has not been terminated by either party, SCT grants Licensee the option to expand the scope of its right of use of the Licensed Software beyond those purposes identified in Sections 3(a)-(d) above to include use of the Licensed Software to provide service bureau data processing services to an unlimited number of third party Covered Services providers in addition to those utility providers identified in Exhibit 2 in accordance with all other terms and conditions of this Agreement. Subject to the restrictions set forth above, Licensee can exercise this option by:  (A) providing SCT with written notice that Licensee is exercising this option, which written notice shall contain sufficient detailed information enabling SCT to identify the third party as a Covered Services provider; and (B) paying to SCT a license fee calculated by multiplying $.50 (50 cents) by the number of Customers of each of the utility providers for whom Licensee proposes to provide the above-described service bureau data processing services (this $.50 per additional customer fee will hereinafter be referred to as the "Residual Fee"), which license fee is payable within twenty (20) days of the submission of the written notice to SCT and, in any event, prior to the provision of any service bureau billing services to any third party utility. Licensee's payment of such license fee shall be in addition to, and not in lieu of,

Licensee's payment of the license fees provided for in Exhibit 1.

(ii) In the event that the number of Customers of these additional third party Covered Services providers (i.e., any providers who are not identified in Exhibit 2 and who are hereinafter referred to as the "Additional Providers") increases beyond the number of Customers existing as of the date of notice provided for in Section 3(e)(i)(A) above (excluding an increase resulting from the "natural growth" of an Additional Provider, where "natural growth" is defined for these purposes as an increase in the number Covered Services customers in the Additional Provider's geographic region of service as of the date of the notice provided for in Section 3(e)(i)(A) above, which growth was not accomplished through a merger, acquisition, consolidation or similar transaction.), Licensee agrees, and is required, to promptly notify SCT of such increase and to pay SCT the Residual Fee in the manner described below. After the first exercise of the option described in Section 3(e)(i) above, Licensee shall submit to SCT at each six (6) month interval a report itemizing in detail the number of Customers of each Additional Provider for whom Licensee is providing billing services as of the date of the report. To the extent that the number of Customers of an Additional Provider have increased above the number of Customers identified in the notice provided for in Section 3(e)(i)(A) above, and such increase is not due to "natural growth" as that term is defined in this subsection above, Licensee shall remit a one-time Residual Fee for each additional Customer and shall include the aggregate additional payment required (if any) for all Additional Providers along with the applicable report. Similarly, in the event that: (i) the number of Customers of Licensee increases beyond Licensee's Customer Base by more than 135,000 Customers; or (ii) the number of Customers of any utility provider listed on Exhibit 2 increases beyond the provider's Customer Base, then, in either event, Licensee agrees, and is required, to promptly notify SCT of such increase and to pay SCT a Residual Fee for the Additional Providers (i.e., by submitting a report every six months and including any additional Residual Fees therewith). In no event will SCT be required to pay any fee to Licensee in the event of a decrease in the number of Customers of a utility provider after payment of a Residual Fee, nor shall Licensee pay any additional Residual Fee to SCT if the total number of Customers of the third party providers to whom Licensee provides Permitted Service Bureau Processing does not exceed the total number of Customers in the Customer Base plus the Customers for whom a Residual Fee has been paid.

(iii) Unless Licensee exercises this option under the terms set forth herein, Licensee is prohibited from using the Licensed Software to provide service bureau data processing services or to otherwise provide data processing services to any third parties other than those provided for in Section 3 above. In addition, notwithstanding anything to the contrary contained herein, SCT's grant of service bureau rights in this Agreement does not prohibit SCT or any of its parents, subsidiaries, affiliates or sister companies from competing with Licensee in marketing and/or selling their products to any provider of Covered Services.

(f) Audit Rights. Licensee shall maintain books and records in connection with its use of the Licensed Software as authorized hereunder. Such records shall include documentation (including executed agreements and Customer billing lists) relating to the number of Customers of Licensee and any utility provider for whom Licensee is providing service bureau data processing services hereunder. SCT may audit the relevant books and records of Licensee to

ensure compliance with the terms of this Agreement. Any such audit shall be conducted during regular business hours at Licensee's offices and shall not interfere unreasonably with Licensee's business activities. If an audit reveals that Licensee has underpaid fees to SCT in excess of ten percent (10%), then Licensee shall pay SCT's reasonable costs of conducting the audit, in addition to the underpaid amount.

(g) Intellectual Property Rights Notices. Licensee is prohibited from removing or altering any of the Intellectual Property Rights notice(s) embedded in or that SCT otherwise provides with the Licensed Software. Licensee must reproduce the unaltered Intellectual Property Rights notice(s) in any full or partial copies that Licensee makes of the Licensed Software.

### 4. Available Services.

(a) Implementation/Support/Training Services. SCT will provide Licensee with implementation/support/training services for the Licensed Software at the fees provided in Exhibit 1.

(b) Consulting and Modification Services. SCT can also provide Licensee with consulting and modification services for the Licensed Software. Fees for consulting and modification services are provided in Exhibit 1.

(c) Personnel. SCT will promptly replace any SCT personnel that are rendering services on-site at a Licensee facility if Licensee reasonably considers the personnel to be unacceptable and provides SCT with notice to that effect, provided that such replacement does not violate any law or governmental regulation applicable to such personnel replacement.

(d) Conditions On Providing Services. In each instance in which SCT is providing Licensee with services, SCT and Licensee will develop a project plan that identifies each party's responsibilities for such services. The project plan will describe in detail the tentative schedule and the scope of services that SCT will provide. Licensee will establish the overall project direction, including assigning and managing the Licensee's project personnel team. Licensee must assign a project manager who will assume responsibility for management of the project. Licensee must ensure that the Equipment is operational, accessible and supported at the times agreed to by the parties in the project plan. While SCT is providing such services, Licensee must provide SCT with such facilities, equipment and support as are reasonably necessary for SCT to perform its obligations, including remote access to the Equipment. If the parties do not develop a project plan in any instance, SCT will nonetheless provide Licensee with services on an as-directed basis. In no such event, however, will SCT be required to provide Licensee with more than eighty (80) person-hours of services in any single calendar week.

### 5. Delivery. Except as otherwise provide in Exhibit 1, SCT will deliver all Component Systems to Licensee at the Delivery Address within thirty (30) days after the Effective Date.

### 6. Payment and Taxes.

(a) Payment. Licensee will pay SCT as provided for in Exhibit 1. Licensee will also reimburse SCT for actual reasonable travel and living expenses that SCT incurs in providing Licensee with services under this Agreement, with reimbursement to be on an as-incurred basis. SCT will use reasonable efforts to limit travel and living expenses by using coach air fare, booked in advance when available, staying at

hotels identified in advance by Licensee as offering Licensee's contractors a discounted rate, and sharing rental cars. Licensee will also reimburse SCT for all charges incurred in connection with accessing Equipment. Reimbursement is subject to any statutory reimbursement limitations imposed on Licensee contractors, and Licensee will provide SCT with a copy of such limitations before SCT incurs expenses. Licensee will pay each SCT invoice by no later than thirty (30) days after receipt. Late payments are subject to a late charge equal to the lesser of: (i) the prime lending rate established from time to time by Mellon Bank, N.A., Philadelphia, Pennsylvania plus one percent (1%); and (ii) the highest rate permitted by applicable law.

(b) Taxes. Licensee is responsible for paying all taxes (except for taxes based on SCT's net income or capital stock) relating to this Agreement, the Licensed Software, any services provided or payments made under this Agreement. Applicable tax amounts (if any) are NOT included in the fees set forth in this Agreement. If Licensee is exempt from the payment of any such taxes, Licensee must provide SCT with a valid tax exemption certificate; otherwise, absent proof of Licensee's direct payment of such tax amounts to the applicable taxing authority, SCT will invoice Licensee for and Licensee will pay to SCT all such tax amounts.

### 7. Limited Warranty, Disclaimer of Warranty and Election of Remedies.

(a) Limited Software Warranty by SCT and Remedy For Breach.

(i) For each Component System, SCT warrants to Licensee that, for period of twelve (12) months after the Delivery Date, the Baseline Component System, as used by Licensee on the Equipment for the computing operations described in Section 3 above, will operate without Documented Defects.

(ii) For each Customization, SCT warrants to Licensee that, for period of six (6) months after Acceptance, such Customization, as used by Licensee on the Equipment for the computing operations described in Section 3 above, will operate without Documented Defects.

(iii) For each Documented Defect, SCT, as soon as reasonably practicable and at its own expense, will provide Licensee with an avoidance procedure (such avoidance procedure which will not have a materially adverse impact on Licensee's ability to use the Licensed Software in the ordinary course of Licensee's business) for or a correction of the Documented Defect. If, despite its reasonable efforts, SCT is unable to provide Licensee with an avoidance procedure for or a correction of a Documented Defect, then, at its election, Licensee may: (i) accept from SCT, with prejudice to all other rights and remedies that Licensee would otherwise have in connection with such Documented Defect, payment from SCT of such amount as SCT reasonably ascribes to the value of such Documented Defect; or (ii) return the Licensed Software to SCT and accept from SCT, with prejudice to all other rights and remedies that Licensee would otherwise have in connection with such Documented Defect, payment from SCT in an amount equal to the total License Fee paid to SCT by Licensee for the Component Systems identified on Exhibit 1; or (iii) subject to the limitations set forth in Section 16 of this Agreement, Licensee may, with prejudice to all other rights and remedies that Licensee would otherwise have in connection with such Documented Defect, pursue its remedy at law to recover direct damages resulting from the breach of this limited warranty. These remedies are exclusive and are in lieu of all

other remedies, and SCT's sole obligations for breach of this limited warranty are contained in this Section 7(a).

(iv) Notwithstanding any other provision of this Agreement, including Section 3(iii) above, SCT shall only be required to provide Licensee with the warranty services set forth in this Section 7(a) for a single instance of the Licensed Software operating on the Equipment at a single location in the United States. In this regard, Licensee shall identify the aforementioned Equipment and location in a writing to SCT as soon as reasonably practicable after the Effective Date and SCT's warranty obligations set forth in this Section 7(a) will only apply to the single instance of the Licensed Software operating on the Equipment and at the location so identified.

(b) Limited Services Warranty and Remedy for Breach. SCT will render all services under this Agreement in a professional and workmanlike manner. SCT will, at its sole expense, re-perform any services that SCT has not rendered in accordance with the foregoing limited warranty. If, despite its reasonable efforts, SCT is unable to re-perform any services in a professional and workmanlike manner, and such failing has a materially adverse impact on Licensee's ability to use the Licensed Software in the ordinary course of Licensee's business, then, subject to the limitations set forth in Section 16 of this Agreement, Licensee may pursue its remedy at law to recover direct damages resulting from the breach of this limited warranty. This remedy is the exclusive remedy for breach of this limited warranty, and SCT's sole obligations for breach of this limited warranty are contained in this Section 7(b).

(c) Disclaimer of Warranty. The limited warranties in Sections 7(a) and 7(b) are made to Licensee exclusively and are in lieu of all other warranties. **SCT MAKES NO OTHER WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH REGARD TO ANY SERVICES PROVIDED UNDER THIS AGREEMENT AND/OR THE LICENSED SOFTWARE, IN WHOLE OR IN PART. SCT EXPLICITLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE. SCT EXPRESSLY DOES NOT WARRANT THAT THE LICENSED SOFTWARE, IN WHOLE OR IN PART, WILL BE ERROR FREE, WILL OPERATE WITHOUT INTERRUPTION OR WILL BE COMPATIBLE WITH ANY HARDWARE OR SOFTWARE OTHER THAN THE EQUIPMENT. LICENSEE WAIVES ANY CLAIM THAT THE LIMITED WARRANTIES SET FORTH IN SECTIONS 7(a) AND 7(b) OR THE REMEDIES FOR BREACH OF SUCH LIMITED WARRANTIES FAIL OF THEIR ESSENTIAL PURPOSE.**

(d) Abrogation of Limited Warranty. Except as otherwise expressly provided for in this Section 7(d), the limited warranty in Section 7(a) will be null and void if: (i) anyone (including Licensee) other than SCT modifies the Baseline Component System; or (ii) Licensee does not implement changes that SCT provides to correct or improve the Baseline Component System. If despite any modification of the Component System, SCT can replicate the reported problem in the Baseline Component System as if the problem were a Documented Defect, then SCT will nonetheless provide Licensee with an avoidance procedure for or a correction of that reported problem for use in the Baseline Component System as though the reported problem were a Documented Defect. Further, and without limitation, notwithstanding that Licensee has modified the Baseline Component System, SCT will nevertheless continue to warrant the Baseline Component System (as otherwise provided for in Section 7(a) above) so long as Licensee maintains a discrete copy of the same.

(e) **FAILURE OF ESSENTIAL PURPOSE. THE PARTIES HAVE AGREED THAT THE LIMITATIONS SPECIFIED IN SECTIONS 7 AND 16 WILL SURVIVE AND APPLY EVEN IF ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE, AND REGARDLESS OF WHETHER LICENSEE HAS ACCEPTED ANY LICENSED SOFTWARE OR SERVICE UNDER THIS AGREEMENT.**

8. **Confidential Information.** Except as otherwise permitted under this Agreement, the Recipient will not knowingly disclose to any third party, or make any use of the Discloser's Confidential Information. The Recipient will use at least the same standard of care to maintain the confidentiality of the Discloser's Confidential Information that it uses to maintain the confidentiality of its own Confidential Information of equal importance. Except in connection with the Licensed Software and any software provided with the Licensed Software, the non-disclosure and non-use obligations of this Agreement will remain in full force with respect to each item of Confidential Information for a period of ten (10) years after Recipient's receipt of that item. However, Licensee's obligations to maintain both the Licensed Software and any software provided with the Licensed Software as confidential will survive in perpetuity.

9. **Indemnity by SCT.** SCT will defend, indemnify and hold Licensee harmless from and against any loss, cost and expense that Licensee incurs because of a claim that use of a Baseline Component System infringes any United States Intellectual Property Rights. SCT's obligations under this indemnification are expressly conditioned on the following: (i) Licensee must promptly notify SCT of any such claim; (ii) Licensee must in writing grant SCT sole control of the defense of any such claim and of all negotiations for its settlement or compromise (if Licensee chooses to represent its own interests in any such action, Licensee may do so at its own expense, but such representation must not prejudice SCT's right to control the defense of the claim and negotiate its settlement or compromise); (iii) Licensee must cooperate with SCT to facilitate the settlement or defense of the claim; (iv) the claim must not arise from modifications made by anyone other than SCT or (with the express exception of the other Component Systems and third party hardware and software specified by SCT in writing as necessary for use with the Licensed Software) from the use or combination of products provided by SCT with items provided by Licensee or others. If any Component System is, or in SCT's opinion is likely to become, the subject of a United States Intellectual Property Rights claim, then SCT, at its sole option and expense, will either: (A) obtain for Licensee the right to continue using the Component System under the terms of this Agreement; (B) replace the Component System with products that are substantially equivalent in function, or modify the Component System so that it becomes non-infringing and substantially equivalent in function; or (C) refund to Licensee the portion of the license fee paid to SCT for the Component System(s) giving rise to the infringement claim, less a charge for use by Licensee based on straight line depreciation assuming a useful life of five (5) years. **THE FOREGOING IS SCT'S EXCLUSIVE OBLIGATION WITH RESPECT TO INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS.**

10. **Term and Termination.**

(a) Right of Termination. A party has the right to terminate this Agreement if the other party breaches a material provision of this Agreement. Either party has the right to terminate this Agreement at any time while an event

or condition giving rise to the right of termination exists. To terminate this Agreement, the party seeking termination must give the other party notice that describes the event or condition of termination in reasonable detail. From the date of its receipt of that notice, the other party will have thirty (30) days to cure the breach to the reasonable satisfaction of the party desiring termination. If the event or condition giving rise to the right of termination is not cured within that period, this Agreement will automatically be deemed terminated at the end of that period. However, notice to SCT of a suspected Documented Defect will not constitute a notice of termination of this Agreement.

(b) Effect of Termination. Upon termination of this Agreement by either party, Licensee will promptly return to SCT or (at SCT's request) will destroy all copies of the Licensed Software, and will certify to SCT in writing, over the signature of a duly authorized representative of Licensee, that it has done so.

(c) Survival of Obligations. All obligations relating to non-use and non-disclosure of Confidential Information and indemnity will survive termination of this Agreement.

(d) Termination Without Prejudice to Other Rights and Remedies. Termination of this Agreement will be without prejudice to the terminating party's other rights and remedies pursuant to this Agreement.

(e) Termination by Licensee Upon Commissioners' Disapproval. Licensee shall have the right to terminate this Agreement in its entirety for any reason at its sole discretion if it advises SCT of such decision to terminate pursuant to this Section 10(e) in a writing signed by a duly authorized representative of Licensee and received by SCT at its corporate headquarters in Malvern, Pennsylvania by no later than 5:00 p.m. Eastern Time on Thursday, November 7, 1996. Subject to Licensee's compliance with Sections 10(b) and 10(c) of this Agreement, Licensee's termination of this Agreement pursuant to this Section 10(e) shall be deemed a termination of this Agreement ab initio. Unless SCT receives such termination notice and the return of all copies of the SCT Software or certification that all copies of the SCT Software have been destroyed prior to 5:00 P.M. EDT on November 7, 1996, this Agreement shall remain in full force and effect and shall be enforceable in accordance with its terms.

11. Notices. All notices and other communications required or permitted under this Agreement must be in writing and will be deemed given when: Delivered personally; sent by United States registered or certified mail, return receipt requested; transmitted by facsimile confirmed by United States first class mail; or sent by overnight courier. Notices must be sent to a party at its address shown on the first page of this Agreement, or to such other place as the party may subsequently designate for its receipt of notices. Licensee must promptly send copies of any notice of material breach and/or termination of the Agreement to SCT's General Counsel at 4 Country View Road, Malvern, PA 19355, FAX number (610) 725-7457, or to such other place as SCT may subsequently designate for its receipt of notices.

12. Force Majeure. Neither party will be liable to the other for any failure or delay in performance under this Agreement due to circumstances beyond its reasonable control, including Acts of God, acts of war, accident, labor disruption, acts, omissions and defaults of third parties and official, governmental and judicial action not the fault of the party failing or delaying in performance.

13. Assignment. Neither party may assign any of its rights or obligations under this Agreement, and any attempt at such assignment will be void without the prior written consent of the other party. For purposes of this Agreement, "assignment" shall include use of the Licensed Software for benefit of any third party to a merger, acquisition and/or other consolidation by, with or of Licensee, including any new or surviving entity that results from such merger, acquisition and/or other consolidation. However, the following shall not be considered "assignments" for purposes of this Agreement: SCT's assignment of this Agreement or of any SCT rights under this Agreement to SCT's successor by merger or consolidation or to any person or entity that acquires all or substantially all of its capital stock or assets; and SCT's assignment of this Agreement to any person or entity to which SCT transfers any of its rights in the Licensed Software. Notwithstanding the above, Licensee may, upon first obtaining written consent from SCT (which consent will not be unreasonably withheld or delayed), assign Licensee's rights relating to the BANNER Component Systems licensed under this Agreement to a Licensee affiliate (a "Licensee affiliate" meaning for these purposes any entity controlled by, controlling or under common control with Licensee), provided that both Licensee and such assignee execute an amendment to this Agreement (in a form reasonably acceptable to SCT), specifying that such assignee agrees to be bound by all terms and conditions of this Agreement, and that Licensee shall serve as such assignee's guarantor for all obligations arising under or in connection with this Agreement. Without limiting SCT's right to reasonably withhold its consent for a requested assignment by Licensee, Licensee recognizes and agrees that the Licensed Software has been priced on the basis of the number of utility customers serviced by Licensee and, accordingly, SCT will not consent to an assignment which would result in the Licensed Software being used for purposes unrelated to the servicing of Licensee's Customer Base as it exists immediately prior to the assignment.

14. No Waiver. A party's failure to enforce its rights with respect to any single or continuing breach of this Agreement will not act as a waiver of the right of that party to later enforce any such rights or to enforce any other or any subsequent breach.

15. Choice of Law; Severability. This Agreement will be governed by and construed under the laws of the U.S. state or U.S. territory in which the Delivery Address is physically situated. If any provision of this Agreement is illegal or unenforceable, it will be deemed stricken from the Agreement and the remaining provisions of the Agreement will remain in full force and effect.

16. LIMITATIONS OF LIABILITY.

(a) LIMITED LIABILITY OF SCT. SCT'S LIABILITY IN CONNECTION WITH THE LICENSED SOFTWARE, ANY SERVICES, THIS LICENSE OR ANY OTHER MATTER RELATING TO THIS AGREEMENT WILL NOT EXCEED THE FEE THAT LICENSEE ACTUALLY PAID TO SCT (OR, IF NO DISCRETE FEE IS IDENTIFIED IN EXHIBIT I, THE FEE REASONABLY ASCRIBED BY SCT) FOR THE COMPONENT SYSTEM OR SERVICES GIVING RISE TO THE LIABILITY.

(b) EXCLUSION OF DAMAGES. REGARDLESS WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, IN NO EVENT WILL SCT BE LIABLE TO LICENSEE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES,

WHETHER BASED ON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT SCT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

(e) BASIS OF THE BARGAIN. LICENSEE ACKNOWLEDGES THAT SCT HAS SET ITS FEES AND ENTERED INTO THIS AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF LIABILITY AND THE DISCLAIMERS OF WARRANTIES AND DAMAGES SET FORTH IN THIS AGREEMENT, AND THAT THE SAME FORM AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES.

17. Disputes Resolution Procedure  In the event that the parties have any disagreement, dispute, breach or claim of breach, non-performance, or repudiation arising from, related to or in connection with this Agreement or any of the terms or conditions hereof, or any transaction hereunder including but not limited to either party's failure or alleged failure to comply with any of the provisions of this Agreement (hereinafter collectively the "Dispute"), the parties shall first conduct a three-stage procedure as follows, it being agreed that for purposes of this Section 17, any reference to a particular representative of a party shall also be deemed to include such particular representative's duly authorized successor or designee and such other persons as each party deems appropriate.

(a) Stage One.  A party shall provide notice to the other party of a Dispute, a copy of which also shall be sent to the respective Project Managers of each party.  Within ten (10) business days of the giving of such notice of a Dispute, the Project Managers shall conduct a meeting either to: (i) resolve the matter and set forth such resolution in writing or (ii) define the Dispute in writing including a description of the position of each party and the other projects and tasks which would be affected by the proposed resolution submitted by each Project Manager.  A copy of this writing shall be provided to the persons who are to receive notices pursuant to this Agreement.

(b) Stage Two.  If the Project Managers are unable to reach an agreement, then within ten (10) business days after such meeting, the Vice President, Professional Services of SCT and a Vice President of Licensee shall meet in a mutually agreed upon location in the Greater Philadelphia, Pennsylvania area to attempt to reach a resolution of the matter in light of the description of the Dispute submitted by the parties and further discussion among and between the parties and their respective representatives.  If they are unable to resolve the Dispute, they shall further define the Dispute in writing based upon discussions held at their meeting, if appropriate.  A copy of this writing shall be provided to the persons who are to receive notices pursuant to this Agreement.

(c) Stage Three.  If the Vice President, Professional Services of SCT and the designated Vice President of Licensee are unable to reach an agreement, then within fifteen (15) business days after such meeting, the President of SCT and the President of Licensee shall meet in a mutually agreed upon location in the Greater Philadelphia, Pennsylvania area, which meeting shall also be attended by the other parties involved in Stage One and Stage Two, to attempt to reach a resolution of the matter in light of the description of the Dispute submitted by the parties and further discussion among and between the parties and their respective representatives.

(d) Inability to Resolve Dispute.  If the parties are unable to resolve the Dispute after following the procedures set forth in this Section 17, the parties are entitled to pursue all their remedies at law and in equity.  Notwithstanding the provisions of this Section 17, either party may seek equitable relief at any time without the necessity of first complying with the provisions of this Section 18.

18.  Entire Agreement.  This Agreement contains the entire understanding of the parties with respect to its subject matter, and supersedes and extinguishes all prior oral and written communications between the parties about its subject matter. Any purchase order or similar document which may be issued by Licensee in connection with this Agreement does not modify this Agreement.  No modification of this Agreement will be effective unless it is in writing, is signed by each party, and expressly provides that it amends this Agreement.

THE PARTIES have executed this Agreement through the signatures of their respective authorized representatives.

Effective Date: ___10/31/96___

SCT

By: _____

William T. Mahoney
(Printed Name and Title of Signatory)

LICENSEE

By: _____

Roy H. Stoll, Senior Vice President
(Printed Name and Title of Signatory)

7



**EXHIBIT 1**

Licensee: _____ Utility & Municipal Services, Inc.

Delivery Address: _____ 762 Lancaster Avenue, Bryn Mawr, PA 19010

**EQUIPMENT**: Host(s) or client server configuration(s) and/or combinations of host(s) and client server configuration(s) within the United States of America for which SCT supports the Licensed Software. Licensee acknowledges that certain Component Systems of the Licensed Software may require specific host or client configurations. Licensee, as soon as reasonably practicable, shall provide a detailed written description of the Equipment so that SCT can confirm that it is configuration on which SCT supports use of the Licensed Software. SCT will then advise Licensee whether SCT supports or does not support use of the Licensed Software on the proposed configuration. If SCT does not support use of the Licensed Software on the proposed configuration, Licensee must propose a new configuration until SCT does confirm that it supports use of the Licensed Software on the proposed configuration

**NOTICE**: To use any of the Licensed Software, Licensee must also obtain, install on the Equipment and maintain SCT-supported versions of certain Oracle Corporation database software products and certain software/hardware peripherals. By this notice, SCT is advising Licensee that Licensee should consult with its SCT Professional Services representative to obtain a written listing of such necessary Oracle Corporation database software products and software/hardware peripherals.

**LICENSED SOFTWARE:**

| Component System | Source Code Licensed? (yes/no) | Software Suppl't | Fee |
|---|---|---|---|
| BANNER Customer Information System ("CIS") | Yes | None | $397,500 |
| BANNER Customer Contact System ("CCS") | Yes | None | $66,250 |
| BANNER Electronic Work Queue ("EWQ") | Yes | None | $26,500 |
| TOTAL | | | $800,250 |

*[handwritten: 40?00 and]*

**SERVICES:**

| Description | Service Period* | Rate** | Estimated Fee* |
|---|---|---|---|
| *Implementation/Support Services:* | | | |
| BANNER CIS Installation *(Includes installation for one server and two workstations. Three instances will be created on the server for seed data, development, and training.)* | 56 person-hours | $110/person-hour | $6,160 |
| BANNER CIS Modification Installation/Certification | 24 person-hours | $110/person-hour | $2,640 |
| Requirements Analysis Study | 80 person-hours | $110/person-hour | $8,800 |
| BANNER CIS Project Management *(Full-time, 10 months)* | 10 person months | $17,600 per month | $176,000 |
| BANNER CIS Implementation Support | 184 person-hours 80 (BA)person-hours 80 (PA)person-hours 24 (TW)person-hours | $110/person-hour $110/person-hour $110/person-hour | $20,240 |

| | | | |
|---|---|---|---|
| BANNER CIS Post-Implementation Support | 160 person-hours | | $17,600 |
| | 80(BA) person-hours | $110/person-hour | |
| | 80 (PA)person hours | $110/person-hour | |
| **Technical Training:** | | | |
| BANNER CIS Technical Training | 80 person-hours | | $8,800 |
| | 40 (BA) person-hours | $110/person-hour | |
| | 40 (CS) person-hours | $110/person-hour | |
| **Functional Training:** | | | |
| BANNER CIS Functional Training | 240 person-hours | $110/person-hour | $26,400 |
| BANNER CIS Modified Functional Training | 120 person-hours | $110/person-hour | $13,200 |
| **Supplemental Support:** | | | |
| BANNER CIS Data Conversion Assistance *(Includes 40 hours for conversion planning, 40 hours conversion specifications, and 40 hours go-live support.)* | 120 person-hours | $110/person-hour | $13,200 |
| **Customization:** | | | |
| BANNER CIS Customization and Interface Assistance | 3,000 person-hours | | $330,000 |
| | (BA) person-hours | | |
| | (PA) person-hours | $110/person-hour | |
| | (TW) person-hours | $110/person-hour | |
| | | $110/person-hour | |
| **TOTAL** | | | **$623,040.00** |

*The Service Period and corresponding Fees represent estimates only. Actual fees for services may vary depending on the number of person-hours of services rendered. Licensee will pay SCT for the actual number of person-hours of services rendered on an as-requested time and materials basis.

**For a period of two years from the Effective Date, the rate charged for the Services identified above will be reduced to $85/person-hour for the first 2000 hours of Services provided. After the expiration of the two-year period or the provision of 2000 hours of Services, the rate charged for Services will increase to $110/person-hour. The $623,040.00 estimated Services fee includes the reduction resulting from the $85/person-hour rate described above.

**PAYMENT:** For the Baseline Licensed Software, Licensee will pay SCT fifty percent (50%) of the entire license fee upon execution of this Agreement, an additional twenty percent of the entire license fee upon the Delivery Date, and the remaining thirty percent (30%) of the entire license fee by September 30, 1997. SCT will invoice Licensee for all services and applicable charges on a monthly basis, as SCT renders the services or Licensee incurs the charges, as applicable. Notwithstanding the above, SCT shall invoice and Licensee shall pay for the Customization and Interface Assistance (collectively "Customization")as follows: one hundred percent (100%) of expenses as incurred; sixty percent (60%) of Customization services as the labor is provided (i.e., on a per-hour basis); and forty percent (40%) of the Customization services associated with each Customization upon Acceptance of each Customization.

**Number of Software Supplements Attached:** 0

SCT

By: _____

_William T. Mahoney_
(Printed Name of Signatory)

Title: _President_

**LICENSEE**

By: _____

_Roy H. Stahl_
(Printed Name of Signatory)

Title: _Senior Vice President_

Utility & Municipal Services, Inc.   10/31/96  5:41 PM

# EXHIBIT C

Ventyx, an ABB company
400 Perimeter Center Terrace
Suite 500
Atlanta, GA 30346
United States

(t) +1.678.830.1000
(f) +1.678.830.1010

www.ventyx.com

June 26, 2014

Dear Client,

As a valued Customer Suite client, we wish to advise you that the Customer Suite solution has changed ownership.

On May 15, 2014, Ventyx sold Customer Suite to Hansen Technologies (ASX: HSN), a global business that develops, implements and supports proprietary customer care and billing software solutions for service providers within the energy, pay TV and telecommunications sectors in over 45 countries.

Please be assured that there will be no change to your service. The entire 33-person Ventyx Customer Suite team will be joining Hansen Technologies to provide a seamless transition and ongoing support. Ventyx and Hansen Technologies are committed to working collaboratively under a teaming agreement to provide integrated solutions - delivering expertise and service support from both companies.

Customer Suite is a highly successful product which has set the industry benchmark in customer care and billing for many years. Ventyx is proud of its long association with this product and the high standard with which it is regarded by utilities worldwide.

Following the acquisition of Ventyx by ABB, our business model has evolved to one focused around IT/OT innovation in asset management. Customer Suite was one of the few Ventyx products aimed at supporting retail operations. The sale allows Ventyx to further its pursuit of providing the world's most advanced asset management solutions for energy and natural resource industries.

We sincerely appreciate your loyalty and support of Customer Suite, and our team looks forward to continuing to provide you with the best in customer care and billing that the industry has to offer, with renewed focus and support from Hansen Technologies.

You will receive more information about Hansen Technologies in the coming weeks. In the meantime, if you have any questions, please don't hesitate to contact one of us.

Yours sincerely,

Adam D. Vexler
EVP & General Counsel

**VENTYX**
AN ABB COMPANY

# EXHIBIT D



January 30, 2017

Glenn Lamont
Executive Account Director
Hansen Technologies
The Empire State Building
350 Fifth Avenue
Suite 6510 New York NY 10118

RE:    <u>**Notice of Discontinuation of Payments for Maintenance,**</u>
       <u>**Enhancement or Other Support of BANNER Software**</u>

Dear Glenn:

Please be advised that Aqua America, Inc. ("Aqua") shall no longer require Maintenance, Enhancements or other support services ("Services") from Hansen Technologies ("Hansen") for the BANNER Customer Information System (CIS) BANNER Customer Contact System (CCS), BANNER Electronic Work Queue (EWQ), or other BANNER related software effective April 30, 2017. As such, Aqua shall not pay any fees for Services to be rendered on or after April 30, 2017.

Please be further advised that it is Aqua's position that neither Aqua, nor any affiliate of Aqua, is a party to any ongoing contractual arrangement with Hansen. However, to the extent Hansen contends (or it is determined) that Aqua and Hansen are parties to any ongoing contractual arrangement, this correspondence shall serve as formal notice of Aqua's intent to terminate any such a contractual arrangement effective prior to April 30, 2017.

Thank you for your attention to this matter. Should you have any questions, please call me.

Sincerely,

*WHITNEY S. KELLETT*

Whitney S. Kellett
Chief Information Officer
610 645-4286

762 West Lancaster Avenue, Bryn Mawr, PA 19010

# EXHIBIT E

From: Glenn Lamont [mailto:Glenn.Lamont@hsntech.com]
Sent: Friday, April 14, 2017 6:00 PM
To: Kellett, Whitney; Bobby Slaton
Subject: RE: Aqua/Hansen


Hi Whitney,


Thank you for your note ... and welcome back!


Naturally, we are disappointed that we won't have the opportunity for deeper engagement under our alternative support agreement proposal. We felt strongly felt that this would be a solid foundation for a future Banner 5 upgrade, which we still believe would provide Aqua all the benefits of a replacement system, but at a fraction of the cost.


Regarding maintenance, as previously mentioned, Aqua has not provided sufficient notice to terminate Banner maintenance before the 05/01/17 to 04/30/18 term. Notice was received from you dated January 30, 2017. Under our Technical Currency Agreement (section 5), Aqua is required to notify Hansen of its intent not to extend the Agreement six months prior to the expiration of the then-current year (which would have been October 31, 2016.)


Accordingly, I have attached quotations for Banner and MicroFocus Cobol maintenance for the 2017-2018 term. Please advise if a Purchase Order is required to invoice (although in previous years, this has not been required.) We look forward to receiving your termination notice prior to October 31, 2017, as well as keeping in touch on Aqua's CIS evaluation work.


Kind regards,


Glenn Lamont

Executive Account Director


Office:

+1 212 268 6000

The Empire State Building

350 Fifth Avenue, Suite 6510
New York, NY 10118


Direct:

# EXHIBIT F



May 5, 2017

Glenn Lamont
Executive Account Director
Hansen Technologies
The Empire State Building
350 Fifth Avenue
Suite 6510 New York NY 10118

      RE:    <u>Technical Currency Agreement for **BANNER** Software</u>

Dear Glenn:

      As I informed you in my correspondence dated January 30, 2017, Aqua America, Inc. ("Aqua") no longer requires Maintenance, Enhancements or other support services ("Services") from Hansen Technologies ("Hansen") for the BANNER Customer Information System (CIS) BANNER Customer Contact System (CCS), BANNER Electronic Work Queue (EWQ), or other BANNER related software ("Banner"). In that correspondence I indicated that it is Aqua's position that Aqua is not a party to any ongoing contractual arrangement with Hansen.

      The original agreement and terms governing Aqua's maintenance agreement for Banner were set forth in the Technical Currency Agreement dated October 31, 1996 ("Original Agreement"). The Original Agreement was with SCT Utility Systems, Inc. ("SCT"). In 2003, Indus acquired Banner from SCT. It appears that Indus later was merged or consolidated into Ventyx. We understand that in 2014, Hansen acquired Banner from Ventyx. Again, it appears that it is pursuant to this 2014 acquisition of Banner that Hansen claims assumption of the contractual rights under the Original Agreement. However, the Original Agreement and the apparent attempt to assign it to Hansen is void by virtue of the noted transactions.

      Paragraph one (1) of the Original Agreement incorporates by reference certain provisions of the Software License & Services Agreement ("SLSA") with the same date which specifically includes paragraphs thirteen (13) and fourteen (14). Paragraph thirteen (13) of the SLSA provides as follows:

      *<u>Assignment.</u> Neither party may assign any of its rights or obligations under this Agreement, and any attempt at such assignment will be void without the prior written consent of the other party. . . . However, the following shall not be considered "assignments" for purposes of this Agreement: SCT's assignment of this Agreement or of any SCT rights under this Agreement to SCT's successor by merger or consolidation or to any person or entity that acquires all or substantially all of its capital*

*stock or assets: and SCT's assignment of this Agreement to any person or entity to which SCT transfers any of its rights in the Licensed Software.*

As the assignment is void, there can be no waiver of any rights vis-a-vis Aqua and Hansen (furthermore, paragraph fourteen (14) of the SLSA provides that there is no waiver of any rights). Aqua has not provided any written consent to the assignment of rights to the Original Agreement to Hansen. In order to be excepted from such written consent, Hansen would be required to have both an assignment from SCT and either be: 1) the successor to SCT by merger or consolidation; or 2) have acquired all the stock or assets of SCT. We have no indication that such conditions have been met and as such consider any purported assignment to Hansen to be void.

Thank you for your attention to this matter. Should you wish to discuss this matter further, we would be happy to do so.

Please note that this correspondence is only intended to give an overview of Aqua's position and not intended as a full expression of Aqua's entire legal position and/or all of Aqua's rights which Aqua may raise in any future discussions or proceedings.

Sincerely,

Whitney S Kellett
Chief Information Officer
610 645-4286

# EXHIBIT G

HANSEN

Hansen Banner, LLC
A Hansen Technologies Company

Suite 1160
1155 West Peachtree Street
Atlanta GA 30309

www.hsntech.com

17 May 2017

Whitney S. Kellett
Aqua America, Inc.
Chief Information Officer
762 West Lancaster Avenue
Bryn Mawr, PA 19010
WSKellett@aquaamerica.com

Dear Whitney,

**Aqua America, Inc ("Aqua") and Hansen Banner, LLC ("Hansen") - Technical Currency Agreement for Banner Software**

I refer to your letter to Glenn Lamont dated 5 May 2017.

As you are aware, Aqua executed two contracts with SCT Utility Systems, Inc. ("SCT") in 1996: a Software License & Services Agreement ("License Agreement") and a Technical Currency Agreement ("TCA"). Hansen acquired all of SCT's rights in and under both agreements on May 15, 2014.

Following your email dated 11 April 2017 to Glenn Lamont and Bobby Slaton seeking to terminate the TCA, Glenn advised that the terms of the TCA required Aqua to provide written notification of its intent to not extend the TCA at least six (6) months prior to the expiration of the then-current contract year. Given that Aqua did not provide such notice within the timeframe, the notice received on 11 April 2017 was invalid and, accordingly, the TCA has automatically extended through to 30 April 2018.

Aqua's subsequent letter in response asserts that "Aqua is not a party to any ongoing contractual arrangement with Hansen" because Hansen was not SCT's successor by merger or consolidation and did not acquire all of the stock and assets of SCT".

Hansen is the rightful successor of Indus/Ventyx and SCT with all rights of SCT under the License Agreement and the TCA, including the right to require the applicable termination and notice requirements.

Aqua's position, as set out in your letter, relies on only part of the assignment provisions within paragraph 13 of the License Agreement, which is incorporated into the TCA. Aqua's reading focuses on only part of the exception to the consent requirement and it ignores the portion of the assignment provision that specifically excludes from any consent requirement an assignment of the TCA to any person or entity to which SCT transfers any of its rights in the licensed software.

SCT transferred its rights in the Banner Software to Indus in 2003. Under the assignment provision, SCT's assignment to Indus of the License Agreement and the Technical Agreement in connection with its transfer to Indus of the Banner Software was not considered an assignment for purposes of the TCA and therefore did not require consent. As a result, Indus assumed all of SCT's rights under the License Agreement and the TCA, including the right of assignment in accordance with Paragraph 13 of the License Agreement. Following the transfer of the Banner Software to Indus, Indus changed its name to Ventyx. When Hansen acquired the Banner business from Ventyx in 2014, as part of the acquisition Ventyx transferred to Hansen all rights in the Banner software. Again, this is not considered an assignment for purposes of the TCA and therefore did not require the consent of Aqua.

Notwithstanding the above, since Hansen's acquisition of Banner in 2014, Aqua's course of dealing in paying invoices raised by Hansen and receiving services from Hansen reflects Aqua's consent to an assignment of the TCA and demonstrates Aqua's acknowledgment that a valid contract exists between Hansen and Aqua. Aqua



cannot now claim it is not party to the contractual relationship when its conduct and course of dealings demonstrate otherwise.

Accordingly, the TCA has automatically extended through to 30 April 2018 and, as detailed in Glenn Lamont's email dated 14 April 2017, an invoice will be raised in line with the quotations attached to the email.

If you or Aqua's attorney wish to discuss this letter, Hansen's external attorney, Joshua E. Little, of Durham Jones and Pinegar is fully briefed on the matter and able to discuss with you:

Email: jlittle@djplaw.com
Tel: 435.674.0400

Yours sincerely

Julia Chand
General Counsel & Company Secretary
**Hansen Technologies**

# EXHIBIT H



October 12, 2017

Glenn Lamont                          Julia Chand
Executive Account Director            General Counsel
Hansen Technologies                   Hansen Technologies
The Empire State Building             2 Frederick St,
350 Fifth Avenue                      Doncaster VIC 3108, Australia
Suite 6510 New York NY 10118

RE:   **Notice of Termination for Maintenance, Enhancement or Other Support**
      **of BANNER Software**

Dear Glenn and Ms. Chand:

Pursuant to my correspondence of January of 2017, I advised that Aqua America, Inc. ("Aqua") shall no longer require Maintenance, Enhancements or other support services ("Services") from Hansen Technologies ("Hansen") for the BANNER Customer Information System (CIS) BANNER Customer Contact System (CCS), BANNER Electronic Work Queue (EWQ), or other BANNER related software effective April 30, 2017.  I know Aqua and Hansen continue to discuss the efficacy of the parties' relative positions in relation to the original Technical Currency Agreement dated October 31, 1996 ("Original Agreement").

The January 2017 correspondence indicated that to the extent that there is any ongoing contractual relationship between the parties, Aqua was noticing its intent to terminate the Original Agreement.  Since the January 2017 correspondence contained other issues, I wanted to re-send formal notice of termination of the Original Agreement going forward in an abundance of caution.

Accordingly, while Aqua is of the position that there is no contractual relationship pursuant to the Original Agreement, to the extent there is, or it is found that there is, a valid contractual relationship pursuant to the Original Agreement or in any other manner, *Aqua hereby notices its intent to terminate the Original Agreement, as well as any other agreements or contractual relationship the parties may have for Services.*

This notice is without waiver of our previously articulated arguments regarding the Original Agreement.  All rights and remedies at law or in equity are expressly reserved.  In lieu of a formal update to the designee for notices, this notice is being sent to who we assume are the appropriate recipients.  Please forward this notice to any other proper recipients and please notify us immediately of any designee for notice other than the addressees herein.

Thank you for your attention to this matter.  Should you have any questions, please call me.

Sincerely,

Whitney S. Kellett
Chief Information Officer
610 645-4286